COLUMBIA METAL CULVERT COMPANY, INC., Appellant,

v.

KAISER ALUMINUM & CHEMICAL CORPORATION, Kaiser Aluminum & Chemical Sales, Inc., Robert A. Kennedy and Kennedy Culvert & Supply Company and Robert Kennedy.

No. 77–1846.

United States Court of Appeals, Third Circuit.

Argued Feb. 22, 1978.
Decided May 24, 1978.

Michael M. Baylson, Duane Morris & Heckscher, Philadelphia, Pa., for appellant.

Richard P. McElroy, William H. Roberts, Samuel R. Simon, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for appellees, Kaiser Aluminum & Chemical Corp. and Kaiser Aluminum & Chemical Sales, Inc.

C. Clark Hodgson, Jr., Lee A. Rosengard, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellees Robert A. Kennedy and Kennedy Culvert & Supply Co.

Before ADAMS and HIGGINBOTHAM, Circuit Judges, and MARKEY,* Chief Judge of the Court of Customs and Patent Appeals.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Antitrust litigation seldom partakes of elegant simplicity. Its elaborations find expression both in the intricacies of finely woven legal theory and in the expansiveness of painstakingly detailed factual submissions. In the face of such complexity, considerable value attaches to efforts by the trial judge to confine the task of the jury to manageable dimensions by the judicious use of directed verdicts. Nonetheless, the Seventh Amendment guarantees a party the right to commit the task of determining facts in civil proceedings to a jury. And the difficulties of deciphering the import of extensive and conflicting evidence may not be allowed to disturb the exercise of that right.

In the matter before us, the resolution of charges of antitrust violations in the market for aluminum culvert pipe turns on disputed factual issues of conspiracy, motive, and market definition. The trial judge, however, deemed it appropriate to enter a directed verdict at the close of the plaintiff's case. We are now called upon to determine whether the extensive trial record permitted such an action.

## A. FACTS

### 1. The Parties

This proceeding arose out of the interaction of five entities: Columbia Metal Culvert Company, Inc. (the plaintiff), Kaiser Aluminum & Sales, Inc. (KACSI), Kaiser Aluminum Chemical Corporation (KACC), Robert Kennedy, and Kennedy Culvert & Supply Company.

The plaintiff in this case originated in 1959, when Joseph Bonjourno founded Columbia Steel, a corporation that was to fabricate metal culvert pipes used in highway construction. Three years later, after some financial difficulties, Columbia was reconstituted as Columbia Metal Culvert, the current plaintiff. Columbia Metal's plant in Vineland, New Jersey, specialized in the manufacture of aluminum culvert pipes, which the company then marketed.

KACC and its wholly owned subsidiary, KACSI, constitute the second alignment in the case. KACC manufactures aluminum sheet and coil, from which aluminum culvert pipe, such as Columbia's product is constructed; it then conveys these pipes to KACSI, at a "transfer price" which is not necessarily reflective of either costs or market price. KACSI in turn sells the sheet and coil to pipe fabricators such as Columbia. In addition, KACSI fabricates and sells aluminum culvert pipe itself in competition with the fabricators to whom it supplies sheet and coil. KACSI sells 80% of the aluminum culvert pipe in the United States, although only 79% of its pipe output is aluminum (the rest being steel). Neither of the other large aluminum producers manufactures aluminum culvert.

The third set of parties before us is comprised of Kennedy Culvert & Supply Company, a distributor of KACSI culvert pipe in Southern New Jersey, and its owner, Robert Kennedy, a former salesman for Columbia Metal.

### 2. Background of Dispute

In earlier times, the parties had enjoyed a close business relationship. Columbia's de-

* Sitting by designation.

cision in 1962 to begin producing aluminum culvert was encouraged by KACC and KACSI, who supplied technical assistance, as well as all of Columbia's raw materials. Columbia was one of the few strictly aluminum culvert manufacturers in the country and KACSI manifested an interest in using Columbia as a spearhead to break into the culvert market—a market which had previously been dominated by steel and concrete products. In these amicable years, Robert Kennedy was one of the most successful of Columbia's salesmen.

The core of Columbia's antitrust claim is that in 1971, when Columbia decided to place some of its aluminum orders with Reynolds Aluminum, KACSI determined to put Columbia out of business in retaliation. After learning of the errant orders, the evidence reveals, KACSI refused to sell aluminum to Columbia.[1] In addition, Columbia alleges that in an act of vengeance for Columbia's infidelity, KACSI decided, with KACC's approval, to locate a new culvert manufacturing plant in New Castle, Delaware, within fifty miles of Columbia's plant in Vineland, New Jersey, despite the fact that KACSI's new production unit had earlier been slated for Virginia. Because of the high cost of transporting culvert, there is evidence that the Delaware location meant that Columbia would become subject to severe new competition from KACSI culvert.

At the same time, Columbia maintains, KACSI conspired with Robert Kennedy, still a Columbia salesman, to set Kennedy up in business as an independent distributor of KACSI products in the Vineland area, and thereby to complete the destruction of Columbia's market. Columbia charges that Kennedy used confidential knowledge he had gained from his work with Columbia to underbid Columbia, and that Kennedy and KACSI conspired to avoid competing with one another.

Finally, Columbia claims that it was the victim of a price squeeze consciously engineered by KACSI and KACC to drive independent fabricators such as Columbia out of business. Sheet and coil were transferred from KACC to KACSI below cost, enabling KACSI to make a "profit" on sales of aluminum pipe at prices too low to be matched by independents who had to buy their sheet and coil at market prices. Simultaneously, it is claimed, KACSI, with KACC's concurrence, contrived to raise the price of raw materials confronting Columbia.

As a result of these maneuvers, Columbia asserts, it was driven out of business.

### 3. *The Litigation*

In 1974, Columbia brought the present law suit, which charges Kennedy, KACSI, and KACC with violations of §§ 1 and 2 of the Sherman Act. In addition, the complaint alleges that KACSI is guilty of an infraction of § 3 of the Clayton Act by its attempt to insist that Columbia deal exclusively with KACSI for coil and sheet.

After the jury had heard the twelve days of testimony comprising the plaintiff's case, the trial judge directed a verdict for the defendants on all of Columbia's claims. Judge Cahn held:

1. The evidence "tended to establish" that the relevant market in the case was not, as Columbia contended, a market for aluminum culvert, of which KACSI controlled 80%, but a market for both steel and aluminum culvert, where KACSI sales represented less than 10%.[2]

2. As a result, KACC/KACSI could not be guilty of monopolization in violation of § 2 of the Sherman Act since they possessed no monopoly power in the relevant market.

---

1. While the defendants dispute the allegation that KACSI refused to sell to Columbia, there is ample evidence to allow a jury to find that such was KACSI's policy. N.T. 163, 943–44, 2057–59, 2294.

2. Since this was a motion for a directed verdict after the plaintiff's case was completed, we understand that Judge Cahn ascertained that a jury could not have reasonably determined that the market in question consisted solely of aluminum culvert.

3. Neither could KACC/KACSI be guilty of attempted monopolization since the limited market position precluded a "dangerous probability of success."

4. KACC, KACSI and Kennedy could not be liable for conspiracy to monopolize, on the ground that insufficient evidence had been adduced for a jury to find either specific intent to monopolize or a conspiracy to monopolize in the relevant product market.

5. A jury could not find KACC and KACSI guilty of a conspiracy or combination in restraint of trade under § 1 of the Sherman Act, since not enough evidence had been presented to allow a reasonable inference of conspiracy between KACSI and KACC, and because the market share was too small to allow a finding of restraint of trade.

6. Kennedy and KACSI could not be held liable for conspiracy in restraint of trade because there was inadequate evidence to allow a jury to find a conspiracy between Kennedy and KACSI, a substantial restraint of trade, or an intent to put Columbia out of business.

7. The failure to present evidence on the proper definition of the market for the Clayton Act claim precluded a finding in plaintiff's favor on that issue.

Columbia has appealed each aspect of the directed verdict.

## B. STANDARD OF REVIEW

■ As the trial judge recognized, in evaluating defendants' motion for a directed verdict, the question is whether sufficient evidence has been introduced, when viewed in the light most favorable to the plaintiff and allowing all reasonable inferences in its behalf, to allow a jury to find that relief is warranted.[3]

■ The badinage between the plaintiff and defendants in this case over whether "some" evidence, "substantial" evidence, "any" evidence or a "scintilla" of evidence is necessary in order to defeat a motion for directed verdict impels us to reiterate the Supreme Court's comments of 35 years ago in *Galloway v. United States:*[4]

Nor is the matter greatly aided by substituting one general formula for another. It hardly affords help to insist upon "substantial evidence" rather than "some evidence" or "any evidence" or vice versa. The matter is essentially one to be worked out in particular situations and for particular types of cases. Whatever may be the general formulation, the essential requirement is that mere speculation not be allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.

Where the issues are ones for resolution by the jury, the judge may deprive the jury of its role at trial only where such action is necessary to guard against a verdict founded solely on "mere speculation."

## C. THE MARKET

■ The fulcrum of the district court's opinion was its determination that no jury could reasonably find the relevant market in this case to be composed of any spectrum of products more restricted than "aluminum culvert and steel culvert." This determination reduced the market position of the defendants, as proved at trial, from over 80% of the aluminum market to less than 10% of the aluminum and steel market.[5]

3. *See Patzig v. O'Neill,* 577 F.2d 841, 844–845 (No. 77–1190, 3d Cir. 1978); *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696 n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

4. 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943).

5. The defendants claim that even if the plaintiff's market definition is accepted, no competent testimony in the record establishes the proportion of aluminum culvert manufactured by KACSI in the agreed upon five state geographical market. Since the unrefuted testimony of Mr. Bonjourno, who traded extensively in the geographical market, asserts that the KACSI market share is "around 80%," and since that figure accords with KACSI/KACC's ad-

Such a reduction in market share allowed the trial judge to proceed to draw the conclusions that the case contains no adequate evidence to allow the jury to find monopolization, dangerous probability of monopolization, or restraint of trade. The correctness of the district judge's market determination, therefore, must frame the analysis of the charges brought by Columbia.

### 1. The Mode of Market Definitions

Well-settled principles govern the delineation of the relevant product market in an antitrust case, even if the outcome of their application to individual fact patterns is often less than obvious.

■ The "monopoly" condemned by § 2 of the Sherman Act[6] inheres in the "the power to control prices or exclude competition."[7] To the extent that competition from related products limits the market power of an entity with a dominant position in one product, such an entity is less likely to be found to hold "monopoly" power forbidden by law. This is so because the ongoing competition from other products guards against the ability of the dominant entity to increase prices and makes exclusionary tactics by such a party fruitless, impossible or unbearably expensive. Thus, in resolving the proportion of the "market" controlled as a prelude to an examination of the extent of a firm's power to control prices or exclude competition, the courts look to the range of "commodities reasonably interchangeable by consumers for the same purposes."[8]

■ Similarly, in the context of § 1's prohibition of conspiracies in restraint of trade, except where practices fall under a judicially crafted *per se* ban, a finding of illegality presupposes a determination in any given case that the "effect upon competition in the marketplace is substantially adverse."[9] This inquiry, in turn, necessitates an examination of the boundaries of real competition. As the Supreme Court stated in *Times-Picayune Publishing Co. v. United States* "our inquiry to determine reasonableness under § 1 must focus on 'the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize.' "[10]

■ Therefore, under either § 1 or § 2 of the Sherman Act, judges must attempt to ascertain the flow of commercial interactions. And in exploring this pattern of competition, courts are adjured to follow the well-trodden trail illuminated by the

mitted 80% share of the aluminum culvert market nationwide, there is sufficient evidence in the record on this point to defeat a motion for directed verdict.

Similarly, while we can find no evidence establishing KACSI's proportion of the steel and aluminum market, both counsel agreed at oral argument that the figure was less than 10%.

6. 15 U.S.C. § 2 proscribes the actions of:
Every person who shall monopolize or attempt to monopolize, or conspire, or conspire with any other person or persons to monopolize any part of trade or commerce among the several states.

7. *United States v. E. I. DuPont & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956) *quoted in United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

8. *United States v. DuPont, supra,* 351 U.S. at 395, 76 S.Ct. at 1007.

9. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1346 (3d Cir. 1975), *quoting United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). *See Sitkin Smelting & Refining*, 575 F.2d 440 at 448 (3d Cir. 1978). Even in some classes of cases which fall within the *"per se"* rule market power is relevant to a finding of violation. *See e. g. United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 619–22, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (tying requires market power); *Continental TV Inc. v. GTE Sylvania*, 433 U.S. 36, 65–66, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (White, J. concurring).

10. 345 U.S. 594, 615, 73 S.Ct. 872, 884, 97 L.Ed. 1277 (1953). *See id.* at 612 n. 31, 73 S.Ct. at 882. ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variation in price, only a limited number of buyers will turn . . .); *Coleman Motor supra*; *American Motor Inns v. Holiday Inns*, 521 F.2d 1230, 1247 (3d Cir. 1975).

late Chief Justice Warren in *Brown Shoe Co., Inc. v. United States* : [11]

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics or uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

That path, however, has led to a variety of destinations. It is true, as the defendants here point out, that the Supreme Court in *DuPont*, a § 2 controversy, refused to treat "cellophane" as a product market distinct from other flexible wrapping paper.[12] Yet, in subsequent cases, the Court has countenanced the separation of "accredited central station alarm systems" from non-accredited alarms, noncentral station alarms, and watchman services; [13] the distinction between markets for insulated aluminum and insulated copper wire, despite the fact that the same customers bought each for similar purposes; [14] and the differentiation between championship boxing matches and all other boxing matches.[15] Thus, the breadth of the spectrum of products which have been held to constitute "markets" for antitrust purposes bears out the Supreme Court's observation in *United States v. Continental Can* that:

> *Continental TV Inc. v. GTE Sylvania*, 433 U.S. 36, 52, n. 19, 53, 59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

**11.** 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). *Brown Shoe* was a § 7 case, but its submarket analysis was adopted in a § 2 context in *United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

As we have intimated in prior cases, the inquiries into the scope of competition under § 1 and § 2 are not precisely the same. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347–48, 1349 (3d Cir. 1975) (market definition sufficient for § 1, not § 2); *Glauser Dodge Co. v. Chrysler Corp.*, No. 76–2390/77–1188, 570 F.2d 72 at 81 n. 17 (3d Cir. 1977) (*cert. denied*, —— U.S. ——, 98 S.Ct. 2253, 56 L.Ed.2d 413, 1978) (distinguishing § 1 market definition from § 2 market). *See Fount-Wip v. Reddi-Wip Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978) (§ 1 verdict affirmed, § 2 verdict reversed on failure to prove market adequately), *cf. United States v. E. I. DuPont & Co.*, 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (distinguishing between monopolization attempt to monopolize and conspiracy to monopolize with regard to market definition). The § 2 market definition looks to the *existence of competitors as evidence of countervailing power* which would preclude monopolization. § 1, in contrast, is concerned with patterns of competition as a means of judging whether a restraint of trade is unreasonable. Thus, rival products might provide sufficient competition to foreclose a finding of monopolization, yet the degree of insularity of the initial product might allow a finding of illegal restraint of trade in regard to restrictions imposed within that initial market. For instance, stifling intra-brand competition may violate § 1, while "monopoly" over a given brand would clearly not run afoul of § 2. *See*

**12.** *United States v. E. I. DuPont & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

**13.** *United States v. Grinnell Corp.*, 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

**14.** *United States v. Alcoa (Rome)*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).

**15.** *International Boxing Club of N.Y. Inc. v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

In relying upon *United States v. Continental Can*, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), as an example of the impropriety of treating competing products as separate markets, the district court appears to have misinterpreted that case. The court in *Continental Can* held that for antitrust purposes the "meaningful competition" between glass and metal containers implied that a relevant market could be constructed of those two product lines. The Supreme Court carefully elaborated, however, that "Glass and metal containers were recognized to be two separate lines of commerce." *Id.* at 456, 84 S.Ct. at 1747. Moreover, "that there is a broader market made up of glass metal and other competing containers does not necessarily negative the existence of submarkets of cans, glass, plastic, or cans and glass together, for 'within the broad market, well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'" *Id.* at 458, 84 S.Ct. at 1747.

[T]he [legal] guidelines offer no precise formula for judgment and they necessitate, rather than avoid, careful consideration based on the entire record.[16]

■■■ As this Court recently indicated, a pronouncement as to market definition is not one of law, but of fact, and as such, a party in a private action may allocate it to the jury.[17] Meticulous "color-matching"[18] of precedent to determine how similar a particular product is to others which have or have not constituted markets in other cases is thus not nearly so important as a detailed examination of the record developed in the trial court.[19]

### 2. The Market as Presented at Trial

According to the evidence here, culvert pipe is used primarily in large construction projects, such as housing developments and highways, to provide channels for draining surface water. Three types of culvert pipe are manufactured: steel, concrete, and aluminum. There was testimony from a number of witnesses that since all three materials have different physical properties, with rare exceptions specifications for construction projects call for only one type of culvert.[20] As a result, on most occasions—once the engineering specifications for the project have been fixed—the contractor who actually purchases culvert pipe may choose only among different manufacturers of the same material. From the contractor's point of view, there could reasonably be said to exist distinct markets for aluminum, for steel and for concrete pipes. Consequently, if a monopolist in aluminum culvert avoided exceeding the price necessary to induce engineers not to specify aluminum, he might well be able to raise prices without fearing encroachment on his sales from other products.

Nor would a jury have acted unreasonably in finding, on the basis of the record here, that the patterns of action on the part of engineers who specify the type of culvert to be used establish aluminum as a separate market. For there was testimony that price was not the crucial variable in the choice by engineers among the materials used to drain surface water. Roy Elam, a former city engineer who qualified as an expert witness, testified that in his experience "cost is checked out at the end of the design," and "budget numbers are not influenced much" by the cost differentials between concrete, aluminum and steel.[21] He also indicated that the choice among the materials was made primarily on the basis of their physical properties, rather than price.[22]

16. 378 U.S. at 449, 84 S.Ct. at 1743.

17. See Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1349 (3d Cir. 1975).

18. Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (Frankfurter, J.).

19. It is for this reason that the defendants' reliance on United States v. Amsted Industries, Inc., CCH 1974–2 Trade Case ¶ 75,208 (N.D.Ill. 1974) and United States v. Johns-Manville Corp., 231 F.Supp. 690 and 259 F.Supp. 440 (E.D.Pa.1966) (Van Dusen, J.), which refused to find submarkets composed of particular varieties of pipes, is misplaced. The evidence submitted to the finders of fact in those situations clearly differed from the record in the case before us, which involves a wholly different set of litigants. We also note that Amsted was decided after a full trial rather than on a motion for a directed verdict.

20. N.T. 36 (Joseph Bonjourno, president of Columbia); N.T. 1272–73 (Roy Elam, former county engineer); N.T. 1282 (Don Spoltore, contractor). Carlos Chaffin, of Reynolds Aluminum, however, testified that specifications generally called for aluminum and steel as alternatives.

Since we deal here with a directed verdict, of course, we must resolve conflicts in testimony in favor of the plaintiff. In view of this standard we are somewhat puzzled by the district court's assertion that "in many instances" both aluminum and steel pipe were specified. (36a).

21. N.T. 1202.

22. Id. N.T. 1216. See SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 at p. 1064 (3d Cir. 1978) (Market definition must take into account the fact that physicians, who regulate use of drugs are not cost-conscious. Therefore, despite overlap in capabilities, drug with unique features constitutes separate market). There is also evidence that the New Jersey Highway Department takes the position that physical capabilities of culvert rather than cost should be the deciding factor. N.T. 1216.

Credible testimony was produced to show that there is considerable difference among the physical properties of concrete, aluminum and steel: Concrete is stronger than steel, which in turn is *stronger than aluminum*. Concrete culverts, being smooth, conduct water better than steel or aluminum culverts, which are made out of corrugated metal. But steel and aluminum are easier to work with.[23] Further, steel generally is stronger than aluminum. Because of this, and because it has been in the market longer, steel is more widely used than aluminum. The State of New Jersey and the Federal government on occasion specify steel, but forbid aluminum.[24] There was also testimony, however, that aluminum resists corrosion better than steel and is more durable, particularly in salt-water regions. As a result, Elam asserted, aluminum is used to the exclusion of steel "along the shore." [25] Aluminum is also lighter than steel, and thus is *preferred in marshy areas,* where access for heavy equipment would be difficult.[26]

In sum, Elam stated that, as to engineering properties, there was "no way you could say these three [types of culvert] are interchangeable," [27] and that the materials "were not in competition from an engineering standpoint." [28]

Thus, there is evidence from which the jury could reasonably have concluded, as did Mr. Elam, that aluminum is recognized by customers as a "specialty material used only in special applications." [29] Aluminum culvert could therefore have been found by the jury to constitute a separate submarket.[30]

Defendants point to testimony by producers of aluminum culvert pipe, including the plaintiff's president, which makes reference to "competition" between aluminum and steel manufacturers in attempting to have their respective products specified by engineers. They also refer to statements by KACSI and Reynolds employees that prices of aluminum culvert are set with reference to steel.[31]

**23.** N.T. 1159, 1185; 1212–1220 (Elam).

**24.** N.T. 676 (Bonjourno).

**25.** N.T. 1219. *See* N.T. 676 (Bonjourno: customer "would only accept aluminum" in salt water environment); N.T. 886 (Buchy, of KACSI: better acceptance around salt water environment); N.T. 1549 (Arvay, manufacturer: *aluminum's longer life in salt-water environment makes it desirable*).

**26.** N.T. 1220 (Elam). *See* N.T. 676 (Bonjourno).

**27.** N.T. 1158–59.

**28.** N.T. 1267–69. Chaffin, of Reynolds stated that the products were "not completely interchangeable," though they were "interchangeable." N.T. 2101. *Cf.* N.T. 1385 (Schamberg, salesman: "no competition because engineers feel very strongly about their products").

**29.** N.T. 1221, 1226. *See* N.T. 1549 (Arvay, aluminum manufacturer: "aluminum is a very specialized product").

**30.** Evidence on most other indicia of submarket existence was equivocal, but could reasonably be understood to support plaintiff's position.

No figures were presented on cross-elasticity of demand. On one hand Collins testified that "*it is possible*" that Bonjourno had said that he lost business as a result of lower concrete

prices. N.T. 1653. And the statement that price levels of sheet aluminum and sheet steel were related (Chaffin N.T. 2114) could be taken to imply that consumers switched back and forth in response to price between the two varieties of culvert, allowing manufacturers to purchase whichever sheet was cheaper. On the other hand, Elam testified that despite the great increase in concrete and steel prices, he gave no consideration to substituting aluminum for concrete. N.T. 1212. And the rough studies introduced at trial showed little sensitivity of aluminum culvert prices to price changes of other culvert types.

It is true there was testimony that the same *production facilities can be used to turn out* both steel and aluminum culvert, and that the same companies often manufacture both. This, however, is not enough to preclude the existence of submarkets as a matter of law. *Compare Brown Shoe Co. v. United States,* 370 U.S. 294, 326, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (men's, women's, children's shoes are separate submarkets) with *id.,* 367, 82 S.Ct. 1502 (Harlan, J., dissenting) (plants may be shifted between production of the three types of shoes).

**31.** *E. g.* N.T. 192, 189, 616, 571–72 (Bonjourno); N.T. 2336, 2338–39 (Collins, KACSI); N.T. 1977 (Melrose, Reynolds employee). *But see* N.T. 564–66 (Bonjourno: did not compete often with steel).

Although such testimony is surely not irrelevant to the definition of a market, neither is it determinative in the context of this case. First, it is not the perceptions of manufacturers but those of consumers which are most salient in the determination of market boundaries.[32] More important, the existence of competition between two product lines does not alone preclude market power within each line, if each product has a cadre of customers in which it enjoys a decisive advantage. For example, in *United States v. Grinnell*,[33] the Supreme Court acknowledged competition between the defendants' "central station alarm" system and other protective devices. Indeed said the Court:

> We recognize that (as the district court found) [the defendants] do not have unfettered power to control the price of their services . . . due to the fringe competition of other alarm or watchman services.[34]

Nonetheless, the Court held that the central station services constituted a separate market, since "some customers will . . . be unwilling to consider anything but central station protection."[35] From the evidence presented, it would not have been unreasonable for the jury here to have made a similar finding. Accordingly, we must reject the trial judge's conclusion that the evidence "establishes that aluminum culvert pipe is not a separate submarket from steel culvert pipe."[36] Inasmuch as there was sufficient evidence to go to the jury on this central question, we treat the market, at least for purposes of this appeal, as composed of aluminum culvert pipe.

## D. MONOPOLIZATION

The directed verdict against the plaintiffs on the claims that the defendants monopolized, attempted to monopolize, and conspired to monopolize in violation of § 2 was based on the trial judge's prior conclusion that steel and aluminum, rather than aluminum culvert pipe alone, constituted the relevant market. Based on the small percentage of the steel and aluminum market which the defendants represented, the trial judge held that there was insufficient evidence to allow a jury to find monopolization, the probability of success necessary for attempted monopolization,[37] or the specific intent prerequisite to liability on a conspiracy to monopolize.

32. *See e. g. SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089 at page 1115 (E.D.Pa.1976) (Higginbotham, J.) affirmed No. 77–1232, 575 F.2d 1056 (3d Cir. 1978); *Beatrice Foods, Inc. v. FTC*, 540 F.2d 303 (7th Cir. 1976); *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547, 551 (1st Cir. 1974) *cert. denied* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

33. 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

34. *Id.* at 574, 86 S.Ct. at 1706.

35. *Id.* Also instructive is *United States v. Alcoa (Rome)*, 377 U.S. 271, 275, 84 S.Ct. 1283, 1286, 12 L.Ed.2d 314 (1964), where the Supreme Court said:

> Admittedly there is competition between insulated aluminum conductor and its copper counterpart, as the District Court found. Thus in 1959 insulated copper conductor composed 22.8% of the gross additions to insulated overhead distribution lines. . . Yet, we conclude that the degree of competitiveness does not preclude the division [of aluminum from copper] for purposes of § 7 into separate submarkets.

36. District court's opinion p. 6.

37. In *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 n. 17 (3d Cir. 1975), we declined to follow the Ninth Circuit's rule that it is possible to find an "attempt to monopolize" a "part of commerce" in violation of § 2 without first determining the share of the relevant market controlled by the defendant. *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474–75 (9th Cir. 1964); *Greyhound Computer Corp. v. International Business Machines*, 559 F.2d 488, 504 (9th Cir. 1977) (and cases cited therein). Instead, "at least in a case such as this," we utilized the criterion of *Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), which required sufficient market power to come dangerously close to success. *Coleman Motor Co. supra*, at 1348. *See Rea v. Ford Motor Co.*, 497 F.2d 577, 590 n. 28 (3d Cir. 1975); *but cf. United States v. E. I. DuPont & Co.*, 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (distinguishing market inquiry relevant to monopolization from that relevant to attempts or conspiracies to monopolize; commenting that where allegations of conspiracy and combination to monopolize are present, "the scope of the market was not in issue").

Since we hold that a conclusion that aluminum culvert pipe constituted a relevant market was not unreasonable, the foundation of the directed verdicts on the § 2 counts collapses.

■■■ There was sufficient evidence from which the jury could have inferred that KACSI attempted to drive Columbia out of business. Holmes Collins, the manager of KACSI's highway division, was heard to say that if Columbia bought metal from Reynolds he, Collins, would locate an aluminum culvert plant in Columbia's "backyard."[38] This was relevant because transportation of culvert is a significant item of expense for the product in question, and a local manufacturer of culvert has an advantage over one whose plant is at a distance from the place of delivery.[39] In fact, Collins did so locate a plant, despite the fact that there was evidence that his original plans called for a Virginia situs.[40]

Moreover, the jury could have found that Collins extended credit to Kennedy, a competitor of Columbia, against the recommendations of the KACSI credit department,[41] thus showing that KACSI engaged in conduct against its business interest in order to damage the plaintiff.

More generally, there was evidence that KACC transferred sheet and coil to KACSI at accounting prices that were less than production cost and well below market price, enabling KACSI to sell pipe more cheaply than independent fabricators could manage.[42] While this may not be a classic predatory pricing endeavor, it effectively allowed KACSI to drive independents out of the market. Finally, the prices at which the Delaware KACSI plant sold culvert were lower than those KACSI charged at certain other plants, despite the fact that costs in Delaware were no lower—giving rise to a permissible inference that prices were depressed in an effort to harm Columbia.[43]

From the testimony and from KACSI's actions against its business interests, the jury could have inferred that KACSI intended specifically to punish Columbia for buying from Reynolds. And given the formerly close relations between KACSI and Columbia, the jury might well have inferred that KACSI knew of the drastic impact its maneuvers would have on Columbia's prospects for survival. Such activities, engaged in by an entity controlling more than 80% of the market, would be sufficient to allow the jury to find both the anticompetitive effects and intent requisite to liability for monopolization or attempted monopolization.

**38.** N.T. 858.

**39.** N.T. 1299, 1316 (Spoltore, contractor).

**40.** N.T. 2002, 2012. *Compare Schine Chain Theatres v. United States*, 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948), where the Supreme Court upheld an inference of unlawful purpose violative of §§ 1 and 2 from the finding that "Schine made threats to build theaters or to open closed ones in order to force sales of theatres in various towns or to prevent entry by an independent operator."

**41.** Exhibit P–75 (reproduced at 439a–441a) (memo from credit department finding "no basis for taking on" the credit exposure necessary to allow Kennedy to operate, noting necessity to provide "long term financial assistance"); Exhibit P–24 (reproduced at 438a) (unsigned Kaiser memo noting that for Kennedy to succeed, Kaiser must "maintain his profit margin" in the face of increased competition). *See* Exhibit P–5, (letter from Collins to Kennedy stating Collins' intention to "make Kennedy a success").

**42.** N.T. 2407–9, 2450–52, 2433–35, 2448–49 (C. E. Parker, KACC official, stating that "transfer prices" were lowered to below manufacturing cost, even excluding depreciation; KACSI profit was calculated using "transfer prices" as cost of materials).

**43.** N.T. 2336–2339.
The testimony of Mr. Arvay, an independent aluminum culvert fabricator operating in the southern part of the United States, is also supportive of the plaintiff's theory. Arvay stated that after he "refused point blank" to purchase his raw materials exclusively from Kaiser, Kaiser began to compete in his area, where they had not previously been active. N.T. 1533. His perception of the competition matched the "price squeeze" alleged by the plaintiff here: Kaiser marketed finished pipe a fraction of a cent above the price Arvay paid for raw materials. N.T. 1533–41.

Accordingly we reverse the directed verdict as to defendants KACSI and KACC on the § 2 counts.[44]

## E. CONSPIRACY IN RESTRAINT OF TRADE

By its terms, § 1 of the Sherman Act proscribes "every combination . . or conspiracy in restraint of trade." Liability under that section obviously requires a finding of a combination or conspiracy. In addition, under well-worn judicial interpretation, a finding of a § 1 violation entails a determination that such conspiracy or combination *unreasonably* restrains trade.[45] The trial judge here supported his decision to grant a directed verdict on the § 1 charge both on the ground that there was insufficient evidence from which a jury could have found a combination or conspiracy, and on the basis that the evidence could not as a matter of law support a

finding that whatever conspiracy allegedly existed unreasonably restrained trade.

The second rationale is untenable in light of our conclusion that the jury could have found that aluminum culvert is a relevant market. If the jury ascertained that KACSI, which controlled 80% of the aluminum culvert market, conspired to drive one of its few competitors (Columbia) out of business, such a conspiracy could have been found by the jury to violate § 1. Since, as we have noted previously,[46] the presence of independent producers in an oligopolistic market serves to limit the market power of the dominant firms, the departure of an independent producer in such a situation adversely affects competition. Where such an elimination is consciously brought about by concerted action to which a dominant entity is a party, at least in the absence of a compelling business justification for such actions, an unreasonable restraint of trade may be found to exist.[47]

---

44. The trial judge held in the alternative that insufficient evidence had been adduced to support a jury finding of conspiracy. Since we hold *infra* that such a conclusion is accurate as to Kennedy and Kennedy Culvert, we affirm the verdict as to those defendants.

45. The doctrinal template which continues to mold the rule of decision for modern cases is the articulation of Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):
Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
*Quoted in, e. g. Continental TV Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 n. 15, 97 S.Ct.

2549, 53 L.Ed.2d 568 (1977); *Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72 at 82 (3d Cir. 1977); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1246 (3d Cir. 1975).
As a further refinement, in certain classes of cases, "agreements or practices . . . because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) *quoted GTE Sylvania, supra*, 433 U.S. at 50, 97 S.Ct. 2549.

46. *Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72 at 83 (3d Cir. 1977), *cert. denied* May 22, 1978; *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975); *see* N.T. 1848–1853 (Prof. Williamson, an economist, testifying as an expert witness, elaborated the adverse effects on competition resulting from driving independents out of business through use of a price squeeze).

47. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975); *American Motor Inns v. Holiday Inns*, 521 F.2d 1230, 1248 (3d Cir. 1975); *Fount-Wip v. Reddi-Wip, Inc.*, 568 F.2d 1296 (9th Cir. 1978); *Taxi Weekly v. Metropolitan Taxicab Board of Trade*, 539 F.2d 907 (2d Cir. 1976).
Since there is sufficient evidence here for a jury to find that KACSI controls 80% of the relevant market, we need not decide the ques-

Thus the issue as to the § 1 violation is whether the trial judge's alternative ground for decision is viable: that there was inadequate evidence to allow the jury to find a conspiracy involving KACSI to put Columbia out of business.

As observed above, there was evidence which could have permitted a jury to infer that KACSI acted with an intent to drive its competitor, Columbia, out of business. The propriety of the directed verdict thus turns on whether, with regard to KACSI and any other defendant,

> . . . the circumstances are such as to warrant [the trier of fact] in finding that the [alleged] conspirators had a unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement.[48]

Consequently, we now turn to examine separately the two groupings which, according to Columbia, harbor such common unlawful purposes.

**1. The Alleged KACSI/KACC Conspiracy**

The first combination alleged to violate § 1 arises out of the joint activities of KACC and KACSI. KACSI is a wholly-owned subsidiary of KACC, sharing joint management on several levels of operation. Because of this, KACSI and KACC suggest that they are incapable of conspiring together. Though legally distinct for most purposes, defendants argue, the reality of the corporate structure of KACC and KAC-SI negatives the plurality of actors legally necessary to form an illegal conspiracy.

This argument is not well-founded in law, for the prerequisites of a conspiracy under § 1 are fulfilled by the presence of two or more legally distinct corporations. Indeed, we recently had occasion to reject a contention of legal inability to conspire with regard to subsidiaries which were "part of an integrated Chrysler enterprise engaged in the manufacturing and marketing of automobiles." The claim that such corporation could not form a § 1 conspiracy, we held, was foreclosed by a line of cases in this Court reaffirming the viability of the "intra-enterprise conspiracy" theory as applied to separately incorporated entities.[49]

---

tion of whether a conspiracy to eliminate a competitor would be a violation of § 1 in the absence of such a market position on the part of one of the conspirators. We note, however, that we have previously stated: "A contract, regardless of actual effect, contravenes the Act if it was intended as part of a scheme to . . . drive a competitor out of the market." *American Motor Inns, Inc. v. Holiday Inns,* 521 F.2d 1230, 1248 (3d Cir. 1975). *See Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1347 (3d Cir. 1975) ("a combination of distributors which through unfair practices eliminates a competitor and leaves it in such a condition that it lacks the ability to continue business . . . has an adverse effect on the market place"); *Oreck v. Whirlpool,* 563 F.2d 54, 58 (2d Cir. 1977) (plaintiff required to show either anticompetitive effect on industry as a whole or that restriction was designed to drive it out of business) (dictum); *Fount-Wip, supra,* (holding that attempt to drive firm out of business violates § 1, even where market is not sufficiently defined to allow finding of § 2 violation).

The position is not without support in Supreme Court decisions. *E. g., United States v. General Motors,* 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966) ("exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins"); *Poller v. Columbia Broadcasting Syst.,* 368 U.S. 464, 468–73, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (attempt to drive independent station out of business by television network makes out § 1 violation even though network's position in market served by television station was limited); *see, e. g. Ramsey v. UMW,* 401 U.S. 302, 304–05, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971) (alleged conspiracy to drive small coal operators out of business); *First National v. Cities Services,* 391 U.S. 253, 284–86, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (alleged conspiracy to drive independent oil producer out of business).

**48.** *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975) *quoting American Motor Inns, Inc. v. Holiday Inns Inc.,* 521 F.2d 1230, 1234, *quoting American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

**49.** *Glauser Dodge v. Chrysler Corp.,* 570 F.2d 72 at 81 (3d Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 2253, 56 L.Ed.2d 413, 1978. *See Cromar Co. v. Nuclear Materials Equip. Corp.,* 543 F.2d 501, 511–12 (3d Cir. 1976); *Coleman Motor Co. v. Chrysler Corp.,* 525

Judge Cahn's holding that there was insufficient evidence to go to the jury on the existence of a KACC/KACSI conspiracy was grounded on a different rationale. The trial judge pursued the opposite approach from the defendants' argument of "functional identity;" while he commented that he harbored doubts as to the capacity of KACSI and KACC to conspire, the trial judge held that rather than being too closely aligned to constitute a conspiracy, KACSI and KACC were not closely enough related. He determined that there was inadequate evidence to allow a jury to find that the two entities shared the requisite unity of purpose. We disagree with this evaluation.

Some of the efforts which allegedly engineered Columbia's elimination were concededly undertaken by KACSI alone. However, the jury could have found that the combined efforts of KACC and KACSI were utilized (1) to impose the price squeeze and (2) to open the New Castle plant.

In finding that prices for sheet and pipe were arrived at by Holmes Collins, KACSI's division manager, independently of KACC, and thus that KACC was not implicated by the price squeeze, the trial judge relied on the testimony of Collins as evoked by the defendants on cross-examination. Were this a finding of fact, and a judgment of credibility, such reliance could not be reversed. However, the defendants' motion was one for directed verdict, and Collins' testimony had been contradicted.

Collins himself stated elsewhere in his testimony that he had no part in setting the "specification price" of coil.[50] This casts doubt on his later assertion that the responsibility for setting all prices was solely his. Moreover, in a memorandum to his subordi-

---

F.2d 1338 (3d Cir. 1975); *Bravman v. Bassett Furniture Co.*, 552 F.2d 90, 101 n. 32 (3d Cir. 1977).

The defendants rely on *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir. 1972), for the proposition that a parent and subsidiary which are "in reality" the same corporation, cannot conspire. However, in *Cromar*, n. 18, we characterized the language upon which the defendants now rely as dictum.

Next, the defendants point to *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products*, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962). But that case also offers scant support for an attack on the intra-enterprise conspiracy doctrine. *Sunkist* held only that the policy behind the Capper-Volstead Act required that two affiliated subsidiaries of a fruit marketing organization be treated as exempt agricultural organizations. Indeed, in *Case Swayne Co. v. Sunkist Growers*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) the Court held that successors to the subsidiaries exonerated in *Sunkist I* were not exempt when their activities included processing by middle-men.

Rather, the Supreme Court has made clear that the choice to adopt dual corporate form subjects businesses to the strictures of the antitrust laws. *Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Schine Chain Theatres Inc. v. United States*, 334 U.S. 110, 116, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The attempt of the student author of Note, *Intra-*

*Enterprise Conspiracy Under Section 1 of the Sherman Act: A Suggested Standard*, 75 U.Mich.L.Rev. 717, to read the Supreme Court cases as applying only to distinct economic entities is unconvincing, particularly in view of its failure to deal with *Schine Chain*.

If limitations on the intra-enterprise corporate conspiracy doctrine are necessary, it seems to us that a more appropriate standard and one more consistent with the cases is that articulated by Professor Sullivan:

"Concerted action" by two "legal persons" which is limited solely to the internal management of a single firm does not restrain competition; but "concerted action" by two "legal persons" which erects barriers to entry by another separate firm . . . can be a restraint of trade. . . . [But] at some point, a diminished level of business integration between two related corporations will warrant a conclusion that they are two firms even though there are some elements of common ownership and control.

*Sullivan, Law of Antitrust*, 328 (1977).

See Report of Attorney General's National Committee to Study the Antitrust Laws 34 (1955) (no violation occurs if the "conspiracy" restrains no trade other than that of the parent and its subsidiaries").

**50.** N.T. 2332. Depending on market conditions, KACSI sold metal at either a "specification price" or a lower "commodity price" to some users. The withdrawal of the lower "commodity price" to culvert manufacturers is alleged to have been a factor in Columbia's demise.

nates, which was admitted into evidence, Collins noted that he "had been chastised for not getting our prices up high enough." [51] Since there was testimony that Collins, as manager of the Highway Products Division of KACSI, reported to the Sheet and Plate Division of KACC,[52] the jury could have inferred that the pricing policies of KACSI were not independent as Collins claimed at trial, but rather arrived at jointly with KACC. Likewise, another KACSI employee, David Thomas, stated that "someone higher up than Mr. Collins" was responsible for a crucial price increase.[53] Again, the jury could reasonably have concluded from such testimony that pricing responsibility was shared with KACC.

Finally, and quite significantly, the keystone of the alleged price squeeze was the price at which KACC transferred coil and sheet to KACSI. So long as the transfer occurred at a price below cost, the predatory effect could be obtained if KACSI kept a sufficient and constant profit margin.

Since KACC set the transfer price at a low level, apparently against its business interests, the jury could reasonably have found participation by KACC in the price squeeze.[54]

▮ In regard to the placement of the New Castle plant, it appears that KACC's approval of Collins' "Request for Investment" was a precondition to his constructing the plant. From this involvement, along with the pricing policy, the close relationship between the companies, and the incentive for both KACC and KACSI to keep control of the market, it would not have been unreasonable for the jury to infer a conspiracy between KACC and KACSI to drive Columbia out of business.

### 2. Alleged Kennedy/KACSI Conspiracy

In contrast to the broad-ranging activities of KACC and KACSI, Kennedy's role in the scenario of Columbia's demise was a limited one. Kennedy left Columbia and opened his own business in competition with his former employer.[55] On its face, such

---

**51.** Exhibit P–950.

**52.** N.T. 2409.

**53.** N.T. 1456–59.

**54.** Compare *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977):

> The law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred, but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational independent choice less attractive than that of concerted action. . . . We recently articulated those circumstances in *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309 [1314] (3d Cir. 1975):
> (1) a showing of acts by the defendants in contradiction of their own economic interests . . . and
> (2) satisfactory demonstration of a motivation to enter an agreement.

*See First Nat. Bank v. Cities Services*, 391 U.S. 253, 284–88, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (intent may be inferred from concerted action where interests of victim and predators conflict, and concerted action would work to the benefit of predators).

**55.** The plaintiff refers to three other types of evidence to support their claim of a Kennedy-Kaiser conspiracy. First, Columbia has adduced testimony which could be understood to indicate that (a) Kennedy used confidential information he had obtained as a Columbia employee in formulating his own bid in Camden County; and (b) Kennedy solicited one Villari as a customer for Kaiser while still employed by Columbia. While such actions, if established might constitute actionable torts and would probably breach a duty of loyalty, their effect on Columbia's economic viability was neither shown to be substantial nor long-lasting. And the fact that Kennedy breached a duty of loyalty on two occasions does little to prove that he shared in Kaiser's anti-competitive design.

Second, Columbia points to what it refers to as the "clandestine meetings" between Kennedy and KACSI regarding the establishment of Kennedy's business while Kennedy was in Columbia's service. In view of the fact that Kennedy had not agreed to a covenant not to compete with Columbia, such meetings establish only that Kennedy "conspired" with KACSI to start his own business—hardly an anti-competitive act—not that he shared KACSI's anti-competitive purpose.

Finally, Columbia notes the fact that KACSI and Kennedy Culvert representatives were heard to comment at a bid that they had "gotten their wires crossed." Even if the comment was not, as KACSI claims, a jest, such hearsay

conduct seems pro-competitive, although perhaps demonstrating less than punctilious faithfulness to Columbia, for it created a new competitive entity. And Bonjourno, president of Columbia, testified that two months before Kennedy left, Bonjourno, in the course of a dispute over Kennedy's salary, told Kennedy that Kennedy could "look around" in Southern New Jersey to see whether he could improve his remuneration.[56] Moreover, Bonjourno reiterated that there were no contractual impediments to Kennedy's leaving Columbia for other employment.[57]

Certainly Kennedy's actions could not be characterized as being against his economic interest. In the four years he was employed by Columbia, Kennedy's sales of pipe rose to $300,000 per year, making Kennedy Columbia's best salesman.[58] Nonetheless, Kennedy's salary increased only from $200 to $325 per week.[59] Nor is there any testimony that Kennedy was attempting to destroy Columbia. A finding that Kennedy consciously shared KACSI's anti-competitive purposes would thus be mere conjecture.

Likewise, the relationship between Kennedy and KACSI was not such as to give rise to a reasonable inference that Kennedy was aware of KACSI's strategy and knowingly associated himself with it. While it is true, as plaintiff maintains, that certain testimony can be taken to imply that KACSI gave Kennedy favored treatment, the record is devoid of evidence that Kennedy was privy to KACSI's broader machinations. And a jury could not have reasonably found that Kennedy knew that the probable effect of KACSI's actions would be to eliminate Columbia. The record is barren of testimony that Kennedy was aware either of Columbia's production costs, or of the price at which it bought metal. Absent this information, Kennedy could not know that the competitive pressure his entrance into the market evoked would prove fatal to Columbia.[60]

Inasmuch as we agree with the district court that there was insufficient evidence from which the jury could find a "unity of purpose, design or understanding," between Kennedy and the other defendants, we sustain the directed verdict as to Kennedy.

### E. CLAYTON ACT

The final count of Columbia's complaint charges KACSI with a violation of § 3 of the Clayton Act, 15 U.S.C. § 14, which makes it unlawful for:

> . . . any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . or other commodities . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Columbia contends that KACSI imposed upon it an exclusive dealing arrangement which precluded it from purchasing aluminum sheet and coil from other manufacturers so long as it bought KACSI materials. Such arrangement, Columbia maintains, substantially lessened competition in the aluminum coil and sheet market. This was true, Columbia alleges, because its purchases, which were foreclosed to other sellers,

---

repetition of an isolated remark without more is too weak a foundation upon which to build a structure of antitrust liability.

**56.** N.T. 374–75.

**57.** N.T. 375–78.

**58.** N.T. 346.

**59.** *Id.* there is also testimony that Kennedy was subjected to increased financial pressures be-

tween 1968 and 1972 due to the birth of his seventh, eighth, ninth and tenth children. N.T. 343–44, 347–78.

**60.** *Cf. Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (holding agent potentially liable where he knew of the "obvious purpose and necessary effect" to eliminate independent stations and "had a personal stake in the outcome").

represented at least 8% of the aluminum coil and sheet market where KACSI held 50% of the total sales. Such foreclosure, Columbia contends, violates the Clayton Act.[61] The district court, however, entered a directed verdict on this question because of the failure of Columbia adequately to prove that aluminum coil and sheet used in culvert fabrication was a "line of commerce" within the meaning of the Clayton Act.

In determining the share of the market preempted as a result of an exclusive dealing arrangement imposed by a producer, a court must look to the alternative customers available to purchase the output of other producers. Here, no evidence was adduced to show whether the output of the facilities which produced the aluminum sheet and coil for the culvert industry could be or were used to manufacture material sold only to fabricators of aluminum culvert pipe. Since this is so, there was insufficient evidence to demonstrate whether aluminum sold to culvert manufacturers, or some much larger market constituted the relevant line of commerce. Thus, the jury would be left without adequate guidance in attempting to delineate the share of the market foreclosed by the alleged exclusive dealing arrangement, or its probable market impact.

Consequently, we do not disturb the directed verdict on the Clayton Act claim.

## F. CONCLUSION

(1) There was sufficient evidence to allow a jury reasonably to conclude that a relevant market for Sherman Act purposes was composed of aluminum culvert.

(2) There was sufficient evidence to go to the jury on the charge that KACSI and KACC violated § 2 of the Sherman Act by monopolizing or attempting to monopolize the aluminum culvert market.

(3) There was sufficient evidence to go to the jury on the charge that KACC and KACSI conspired in restraint of trade in violation of § 1 of the Sherman Act.

(4) There was insufficient evidence to allow the jury reasonably to conclude that Robert Kennedy and Kennedy Culvert conspired with KACSI either in violation of § 1 or § 2 of the Sherman Act.

(5) There was insufficient evidence to allow the jury reasonably to define the "line of commerce" restrained by any exclusive dealing arrangement, and, thus, there was insufficient evidence to go to the jury on the claimed violation of § 3 of the Clayton Act.

The judgment of the district court will therefore be affirmed as to the defendants Kennedy Culvert and Robert Kennedy. As to KACC and KACSI, the judgment will be affirmed insofar as it granted a directed verdict against the plaintiffs on the Clayton Act claims; the remainder of the judgment will be reversed and the case remanded for action consistent with this opinion.

---

**61.** Columbia's calculation is that since there was testimony that KACSI sold 6 million tons of sheet and coil to culvert manufacturers, and that KACSI held at least 50% of the market, Columbia's purchases of one million tons represented at least 8% of the market.